## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MICHELLE WEDDERBURN,      *
     *
     *
     Plaintiff,      *
     *
     v.      *      Civil Action No. 8:19-cv-00215-PX
     *
BOARD OF EDUCATION OF BALTIMORE   *
COUNTY,      *
     *
     Defendant.      *
     ***

### MEMORANDUM OPINION

Pending before the Court is the motion for summary judgment filed by Defendant Board of Education of Baltimore County, ECF No. 68.  The issues are fully briefed, and no hearing is necessary to resolve this motion.[1]  *See* D. Md. Loc. R. 105.6.  For the following reasons, the Court GRANTS in part and DENIES in part the motion for summary judgment.

## I.     BACKGROUND

### A.     Factual History

Plaintiff Michelle Wedderburn has been an educator more than 20 years, working for Defendant Baltimore County Public Schools ("BCPS") since 1996.  ECF No. 77-3 ¶ 6.  She holds a bachelor's degree in early childhood education, a master's degree in school leadership, and an advanced professional certificate from the state of Maryland.  *Id.* ¶¶ 2–3; ECF No. 77-4 at 1–8.  The facts relevant to this matter span four school years, as more fully discussed below.

### 1.     2015–2016 School Year

For the 2015–2016 school year, Wedderburn was the Assistant Principal at New Town High School.  ECF No. 77-3 ¶¶ 6, 8.  In this role, Wedderburn's assisted in "planning,

---

[1] The motion for oral hearing (ECF No. 81) is denied.  *See* D. Md. Loc. R. 105.6.

implementing, directing, and evaluating [of] school programs and activities."  ECF No. 68-4 at
28.  Wedderburn also evaluated teacher performance, planned leadership development
programming, and monitored occasional after-school and weekend activities.  *Id.*

On October 9, 2015, Wedderburn was severely injured when she attempted to break up a
fight between two students.  ECF Nos. 77-3 ¶¶ 8–10; 68-7 at 34; *see* ECF No. 77-5 at 1–2.  She
suffered a concussion, aggravation of pre-existing herniated disk and knee injury, and damage to
her lower back and left arm.  She also developed Post Traumatic Stress Disorder ("PTSD").
ECF Nos. 77-3 ¶¶ 4–5, 8–10; 77-4 at 9–12; 77-12 at 3–4; 77-11 at 26–27.  To this day, she
suffers from the physical and emotional effects of this altercation.

Although the record is spotty as to the parties' immediate responses to the injury, BCPS
had given Wedderburn certain accommodations arising from the injuries she sustained.  ECF No.
77-5 at 3.  Maryland Workers Compensation declared Wedderburn temporarily totally disabled
from October 9, 2015 through October 23, 2015.  *Id.* at 1–3.  Thereafter, BCPS required
Wedderburn to submit to an independent medical evaluation ("IME") on December 23, 2015,
and January 6, 2016, to assess whether Wedderburn could do her job without restrictions.  ECF
No. 68-4 at 48.  Wedderburn apparently had recovered such that she was able to return to work
in January of 2016.  *Id.*  Wedderburn was directed to resume her full duties as Assistant Principal
without restrictions by March 7, 2016.  *Id.*

On March 8 and April 5, 2016, Wedderburn submitted several accommodation requests
to BCPS' Equal Employment Opportunity Office ("EEO Office").  She asked for a reduction in
work hours; to receive "cognitive breaks" and "extended time" for completing her work;
"streamline[d] work processes;" and permission to wear earplugs.  ECF No 68-4 at 44.  BCPS,
through EEO Officer Assata Peterson ("Peterson"), denied the work hour limitation as

2

unreasonable because it ran contrary to the core functions of an Assistant Principal—to be present for before and after school activities when necessary. *Id.* at 44–45.  Peterson also denied the request for additional time to complete tasks as ambiguous and unreasonable and denied the request for earplugs because they would "prevent [Wedderburn] from hearing or responding to [her] radio or hearing student interactions in the hallways or in the cafeteria." *Id.* at 45.  The request for "cognitive breaks" was neither approved nor denied, Peterson noting that Wedderburn can determine on her own when she needed a break. *Id.* at 44.  Wedderburn made the same requests on April 28, 2016, which were all denied on the same grounds. *Id.* at 46–47.

The next month, Wedderburn renewed her requests.  While Wedderburn's IMEs had concluded she could return to work, Wedderburn submitted medical documentation reflecting that her physicians disagreed.  ECF No. 68-4 at 48.  Wedderburn's treating doctor documented that injuries from the altercation affected her "ability to hear, speak, see and concentrate," and that the duration of her condition is "impossible to know." *Id.*  From this, Peterson concluded that Wedderburn's numerous requests "indicates that [she] cannot or [is] unwilling to work without the requested restrictions." *Id.*  Thus, Peterson placed Wedderburn in BCPS' Options process. *Id.* at 49–50.

The Options process allows employees who have been deemed medically unfit to perform their essential job functions to seek alternative positions, or "options" within the school system.  ECF No. 68-5 at 4.  While looking for another employment "option," within BCPS, an employee may use her own leave to remain "in positive employment status."  ECF No. 68-6 at 7.  Wedderburn, however, withdrew her accommodation requests instead of participating in Options.  ECF No. 77-5 at 7–8.  Wedderburn simultaneously complained that EEO Office was using Options as a threat to remove her from her current position, and that Peterson had "grossly

misinterpreted" Wedderburn's requests as signaling an unwillingness to do her job. *Id.*
Nonetheless, it appears that Wedderburn had been reassigned as an early childhood classroom
teacher at Dogwood Elementary School for the 2016–2017 school year. ECF No. 77-5 at 13.

### 2.   2017–2018 School Year

In August 2017, Wedderburn was placed at Cockeysville Middle School ("CMS"), to
resume her position as an Assistant Principal. ECF Nos. 77-3 ¶ 27; 77-5 at 14. CMS had one
Principal, Deb Magness ("Magness"), ECF No. 77-3 ¶ 28, and two Assistant Principals who
shared administrative responsibilities. ECF No. 77-5 at 15. At CMS, Wedderburn was
responsible for conducting observations and evaluations of staff and crafting the master
schedule; overseeing student discipline for the 7th grade and half of the 6th grade; coordinating
with the feeder elementary schools the incoming students; and chaperoning evening and
weekend activities. *Id.*

When Wedderburn started at CMS, she alerted Magness that she sometimes needed to
wear attenuation ear plugs "due to tinnitus and noise sensitivity from a concussion." ECF No.
77-3 ¶ 31. Wedderburn also informed Magness that she was diagnosed with Undifferentiated
Connective Tissue Disease, which required her to avoid the cold, and that the 2015 student
altercation left her with PTSD. *Id.* Magness, in turn, contacted the EEO office to find out if
Wedderburn had any accommodations on file and was told there were none. ECF No 68-3 at 3.
The next day, the EEO Office, through Peterson, informed Wedderburn in writing of the EEO
application process for workplace accommodations. ECF No. 68-4 at 2, 30–31. Wedderburn did
not respond or otherwise request an accommodation. ECF No. 77-3 ¶ 36.

On September 8, 2017, Magness contacted the EEO Office to report that Wedderburn
was wearing earplugs in areas that require administrator attention such as the cafeteria and the

hallways.  ECF No. 68-4 at 3.  On September 25, 2017, Peterson asked Wedderburn about her use of earplugs, and a flurry of email correspondence ensued.   ECF No. 68-4 at 30–43. Wedderburn challenged Peterson as to whether the special kind of earplugs she was using qualified as an accommodation.  *Id.* at 35.  Wedderburn also fought with Peterson about whether she needed to "fill out forms" to wear the particular kind of earplugs that assisted her, and in an email to Peterson, stated: "[t]hey are called attenuation earplugs.  Look them up and get back to me."  *Id.*

Ultimately, Peterson denied Wedderburn's use of attenuation earplugs because the request appeared "not reasonable."  ECF No. 68-4 at 42.  Peterson explained, as she had before, that wearing earplugs presents a safety hazard and impedes the ability to "hear and respond to student interactions," a necessary job function for an Assistant Principal.  *Id.*  But Peterson also rejected outright that there was really any difference between "swimmers" and "attenuation" earplugs and simply concluded that "anything" which "inhibits your ability to hear raises safety concerns."  *Id.*  Peterson, therefore, disposed of the request without further discussion or inquiry. *Id.* at 42–43.

During the same time period, Magness had observed that Wedderburn left work unannounced or to attend doctor appointments, requiring other staff to cover her responsibilities. ECF No. 68-3 at 2–4.  Magness also received several complaints from her staff that Wedderburn had been frequently late in following through on her responsibilities.  On September 26, 2017, Magness met with Wedderburn to discuss these issues, and the conversation quickly deteriorated. According to Magness, Wedderburn began to yell and "rant" about being "nitpicked" on account of her race.[2]  *Id.* at 5.

---

[2] Magness attests that she continued to receive similar staff complaints about Wedderburn's performance through the spring of 2018.  ECF No. 68-3 at 6.

On October 30, 2017, Magness counseled Wedderburn about her lack of timely responses to staff and parent emails, her slow turnaround on certain time sensitive tasks, and double booking herself for administration conferences.  ECF No. 68-3 at 32.  As a result, Magness referred Wedderburn to a school resource consultant to assist Wedderburn in improving time management and organization.  *Id.*

Thereafter, Wedderburn was frequently absent from work for medical appointments. ECF No. 68-3 at 16–26.  On March 23, 2018, Wedderburn requested as an accommodation transfer to a school closer to her healthcare providers.  ECF No. 77-7 at 25.  However, Wedderburn made the request not to the EEO Office, but to BCPS' general counsel because, according to Wedderburn, Peterson had engaged in "repeated harassment."  ECF No. 68-4 at 52. Wedderburn reiterated her transfer request to other administrators, including Magness.  *Id.* at 56.

On June 18, 2018, Magness submitted to Wedderburn her year-end evaluation.  ECF No. 68-3 at 42–46.  Although Wedderburn received an overall rating of "effective," Magness noted several areas of improvement related to time management, communications and organization. *Id.*  Magness further emphasized that Wedderburn had taken 82 hours of leave during the school year due to "family illness or personal illness," and reminded Wedderburn that "the role of assistant principal requires regular attendance" on campus during school hours.  *Id.* at 45. To address these shortcomings, Magness placed Wedderburn in a "performance assistance plan" for the following school year.  *Id.*; ECF No. 68-3 at 7, 50–54.  The plan took effect July 3, 2018. *Id.*

### 3.      2018–2019 School Year

Wedderburn began the 2018–2019 year by reiterating her request to transfer to another school.  She asked for placement closer to her home as an accommodation for her "cervical

radiculopathy, low back pain, neck pain, spinal stenosis in cervical region." ECF No. 68-4 at 59–63. Medical documentation supported her claim that sitting in traffic aggravated her conditions. *Id.* at 63. BCPS, through Peterson, denied the request on several grounds. First, Peterson found the request unreasonable because "driving is not an essential function" for the Assistant Principal position. ECF No. 68-4 at 65. Second, Peterson concluded that even if the request were supported and reasonable, no job openings existed to meet the request. *Id.* Peterson explained that "in the accommodation process, reassignments are made when there are open and available positions. If there are no open positions, then you cannot be accommodated." *Id.*

Between July and December 2018, Wedderburn took a total of 28 days of leave largely without submitting any medical documentation.[3] ECF No. 68-4 at 91–92; ECF No. 68-3 at 55–58. On December 4 and 13, 2018, Wedderburn complained via email to Peterson, Magness, and other BCPS administrators about BCPS' alleged failure to accommodate her. ECF No. 68-4 at 83–86. Wedderburn emphasized that her workload and stresses attendant with the accommodations process had led to "flare[] ups" of her neck, back and knee pain. *Id.* at 83. Wedderburn also described that her back pain was so bad "the ride to work is painful" and she cannot get out of her car. *Id.* at 86. Wedderburn asked again for reassignment to a school closer "to avoid prolonged sitting." *Id.* She also requested a sit stand desk, and reduction in non-specific "production standard[s]." *Id.* When Peterson, in response, provided Wedderburn with information regarding applying for workplace accommodations, Wedderburn demanded that Peterson not call or email her again. *Id.* at 83.

---

[3] The record reflects that Magness had contemporaneously informed Wedderburn that her documentation had been insufficient to support her medical leave. ECF No. 68-3 at 55, 63–64.

On December 14, 2018, Peterson denied Wedderburn's renewed requests for accommodations. ECF No. 68-4 at 87–92. First, Peterson disposed of the earplugs request on the same previously articulated "safety" grounds and that escaping "loud" noises in a middle school environment was unreasonable. *Id.* at 89. Second, Peterson denied Wedderburn's renewed request for reassignment to a school closer to her home, again because no position existed, and driving was not an essential job function. *Id.* at 89–90. Third, Peterson denied Wedderburn a sit-stand desk because she had already been given a portable cart that served the same purpose of the sit-stand desk. *Id.* at 90. Last, Peterson denied the request for reduced "production standards," as "unclear and ambiguous." *Id.*

This time, however, BCPS went further. Citing Wedderburn's excessive absences for illness, combined with her self-described inability to do her job, BCPS placed Wedderburn in the Options process again. ECF No. 68-4 at 91–93. Wedderburn learned of this decision from Magness that same day. During Wedderburn's year-end evaluation, Magness addressed Wedderburn's unauthorized absences from work on account of her medical conditions. ECF No. 68-3 at 8, 55. Magness also provided Wedderburn standard literature on BCPS' Employee Assistance Program and the Family Medical Leave Act ("FMLA") and noted that she will continue to "monitor" Wedderburn's attendance going forward. ECF No. 68-3. at 57. Magness also addressed Wedderburn's continued unprofessional email communication with staff. *Id.* at 55–58. Last, Magness gave Wedderburn information her placement in Options. Wedderburn was then escorted off school property. ECF Nos. 68-3 at 8; 77-3 ¶¶ 78–84.

On January 7, 2019, Wedderburn met with BCPS administrators for her Options conference. She was given a deadline of February 4, 2019, to elect whether she would remain on leave, seek another position in BCPS, retire or resign. ECF No. 77-11 at 8, 16. She signed proof

of the discussion and added that she does not belong in Options because she "is able to perform the essential functions of her job with and without accommodations." *Id.* at 8.  Wedderburn also stated that she had already submitted medical documentation to the EEO office reflecting that she could return to work.  *Id.*

On January 8, 2019, Wedderburn submitted two physician's notes to the EEO Office which stated that she was cleared to return to work.   ECF No. 68-5 at 15.  One simply stated that Wedderburn could have returned to work on December 26, 2018, with no explanation as to what particular medical condition had improved to make this return possible.  *Id.*  The other, issued from a physician at the National Pain and Spine Center, confirmed that Wedderburn could "[r]eturn to work without restriction . . . with or without accommodation."  *Id.*

A week later, Wedderburn, renewed her request to return to work, adding that that she had been examined by "a board approved physician on 1/14/19 at Concentra," who confirmed that she could return to "regular duty" and that she was "released from active care."  ECF No. 68-6 at 1–5.  Wedderburn again declared that she no longer needed accommodations" and withdrew all prior accommodation requests.  *Id.* at 5.   Wedderburn nonetheless remained in Options.  *Id.* at 6–8.

On January 31, 2019, Wedderburn submitted an open-ended request for leave under the FMLA to begin the very day she was to elect a course of action under Options.  ECF No. 68-6 at 11.  As grounds for FMLA, Wedderburn cited her "serious health condition," and included a medical certification from her treating orthopedic physician, Dr. Lisa Grant, dated January 28, 2019.  *Id.* at 12–15.  Dr. Grant attested that the leave request was medically warranted to treat Wedderburn's "flare ups," such that she will need leave one or two times a month for one to two

days at a time. *Id.* at 14.  The FMLA leave request was granted.  ECF Nos. 68-4 at 10; 77-3 ¶ 92.

On February 18, 2019, Wedderburn returned to CMS as an Assistant Principal.[4]  ECF Nos. 77-11 at 25; 77-3 ¶¶ 94–95.  On March 5, 2019, Wedderburn requested the accommodation of a sit-stand desk and an ergonomic chair.  ECF No. 77-11 at 26–27.  Wedderburn was initially provided an ergonomic chair that she claims had aggravated her symptoms.  ECF No. 77-3 ¶ 96.  Ultimately, Wedderburn opted to provide her own ergonomic chair and withdrew her request for a sit-stand desk.  ECF No. 68-7 at 11, 22–26.

On March 14, 2019, Magness issued Wedderburn a negative mid-year evaluation, stating that Wedderburn was failing the assistance plan.  ECF No. 68-3 at 8–9, 69–73.  According to Magness, Wedderburn continued to engage in "unprofessional" email communication, she did not answer emails from coworkers and parents, and she had not undertaken any recommended professional development tasks.  *Id.* at 71–73.  Magness planned to meet with Wedderburn in two weeks to evaluate her progress in rectifying these deficiencies.  *Id.*

On March 25, 2019, Wedderburn again requested reassignment to a school closer to her home as a reasonable accommodation.  ECF No. 68-6 at 18–20.  Peterson denied this request because it was not accompanied by any medical documentation.  *Id.*  The following month, on April 12, 2019, Wedderburn applied for leave under FMLA, citing exacerbation of her PTSD.  ECF No. 68-7 at 13–18.  Wedderburn's treating psychiatrist confirmed her PTSD diagnosis and noted that she was experiencing "hypervigilance, nightmares and flashbacks," requiring medication and therapy.  *Id.* at 16.   The psychiatrist recommended leave for six weeks for her

---

[4] Wedderburn claims that she returned with a co-Assistant Principal sharing her job duties.  ECF No. 77-3 ¶ 94.  The Court accepts her representation but notes that BCPS always employed two Assistant Principals.  ECF No. 77-5 at 13.

medication to take effect, and that she be relocated "to avoid further exacerbations" of her condition. *Id.* at 17. Accordingly, Wedderburn requested FMLA leave from April 11, 2019 until at least May 24, 2019. *Id.* at 14. BCPS denied the request because Wedderburn had not worked enough hours to qualify for FMLA. *Id.* at 13, 19.

The leave request was subsequently referred to Peterson in the EEO office to consider a possible accommodation. ECF No. 68-7 at 19–21. On April 17, 2019, Peterson denied the requested leave as unreasonable. *Id.* at 27–28. Peterson engaged Wedderburn as to what "adjustments" to Wedderburn's work environment would render her able to perform her job as Assistant Principal. *Id.* Wedderburn had no specific requests other than to be moved from CMS. *Id.* Because no other positions were available, Peterson denied the transfer as unreasonable. *Id.* Peterson also referred Wedderburn for an Independent Medical Evaluation to assess her fitness for duty as an Assistant Principal. ECF No. 68-7 at 29–35.

On May 2, 2019, Dr. Steven Seibert, a licensed psychiatrist, evaluated Wedderburn. Dr. Seibert concluded that "no evidence" supported a diagnosis of PTSD and that Wedderburn instead suffers from adjustment disorder. *Id.* Ultimately, Seibert opined that Wedderburn was not suffering from any mental illness that "impairs her capacity to perform the essential functions of an Assistant Principal."[5] *Id.* at 35.

On May 8, 2019, Wedderburn renewed her request for transfer from CMS or alternatively, 90 days of leave as a reasonable accommodation. ECF No. 68-7 at 36. On May 9, 2019, Wedderburn learned that as of May 24, 2019, she will have run out of leave and would transition to unpaid leave status. ECF No. 68-7 at 44. BCPS thus notified Wedderburn that to

---

[5]Although Wedderburn submitted documentation from her treating psychiatrist to support her FMLA request, the record is not clear whether Dr. Seibert ever received such documentation.

keep her employment, she must either return to work, receive approved leave of absence, or acquire leave through the sick bank leave share program.  *Id.*

Four days later, Wedderburn, through counsel, requested as an accommodation "provisional" leave until June 15, 2019, while she engaged in the interactive process with BCPS. ECF No. 68-7 at 42–43.  Wedderburn's counsel enclosed the April 2019 documentation from Wedderburn's psychiatrist and noted that supplemental documentation would be forthcoming. ECF No. 68-7 at 43.  Peterson responded the next day.  First, she deemed the request "unsupported by medical documentation" because the FMLA forms had noted that Wedderburn needed leave from April 11 to May 23, 2019 but said nothing about the basis for needing leave beyond the 23rd.  ECF No. 68-7 at 50–52.  Peterson also emphasized the request, like many before, "calls into question Ms. Wedderburn's ability to return to work," as "attendance is an essential function of any position at BCPS."  *Id.*  at 50.  Peterson chronicled Wedderburn's historic lengthy absences as well as BCPS' decision to maintain her employment benefits "despite her current lack of leave status."  *Id.*  Accordingly, BCPS granted Wedderburn six weeks of leave backdating to April 11, 2019.  ECF No. 68-7 at 50.  Peterson reminded Wedderburn she was required to return to work by May 28, 2019.  *Id.*; ECF No. 68-4 at 13–14.

Wedderburn returned to work at CMS on May 28, 2019.  ECF No. 77-3 ¶ 103.  Roughly two weeks later, Wedderburn again requested multiple accommodations, to include that the school fix the heating and cooling system in her office to avoid extreme temperatures; that she be allowed to regulate her siting and standing to avoid sitting for longer than thirty-minute periods; and a non-specific request to avoid stressful situations.  ECF No. 68-7 at 93–97.  On June 20, 2019, Peterson granted Wedderburn's request to regulate her sitting and standing and denied her remaining two requests.  *Id.* at 98–101.  On June 21, 2019, Wedderburn received her year-end

evaluation from Magness, where she was rated as "ineffective" in all areas.  ECF Nos. 77-3 ¶ 104; 68-3 at 74–80.  On July 15, 2019, Wedderburn's request to transfer was granted to Dumbarton Middle School where she assumed the position of Assistant Principal.  ECF Nos. 68-7 at 147; 77-6 at 1.

### B.      Procedural History

On June 20, 2018, Wedderburn filed a formal EEOC complaint, alleging that BCPS had discriminated and retaliated against her, refused to provide reasonable accommodation, and harassed her on account of her disability, all in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*. ("ADA").  ECF No. 1-4.  On January 23, 2019, Wedderburn next filed suit in this Court against BCPS and Peterson and separately moved for a Temporary Restraining Order ("TRO").  *See* ECF Nos. 1, 3, 10.  Wedderburn sought immediate injunctive relief to prevent BCPS from terminating her.  *Id.*

On February 1, 2019, the Court held a recorded phone conference to discuss the TRO motion.  ECF No. 16.  BCPS confirmed that Wedderburn was not facing termination because she was entitled as a vested employee to a robust review process during which she would remain employed.  Consequently, Wedderburn withdrew the TRO motion and pursued her administrative remedies.  ECF Nos. 31-3 ¶ 27; 17.  Wedderburn next appealed her 2018–2019 performance evaluation to the Executive Director of Secondary Schools.  ECF No. 68-9.  After a hearing held on July 2, 2019, the Executive Director affirmed the evaluation as substantiated and denied Wedderburn's appeal.  *Id.*  Wedderburn next appealed this decision to the Manager of Employee and Student Hearings, serving as the Superintendent's designee.  ECF No. 68-10.  Following a hearing on October 9, 2019, this appeal was also denied.  ECF No. 68-11.

Meanwhile, on April 15, 2019, BCPS moved to dismiss Wedderburn's Amended Complaint.  ECF No. 21.  Wedderburn, in turn, renewed her TRO motion and moved for leave to file a Second Amended Complaint so she could pursue violations of the Rehabilitation Act, 29 U.S.C. § 701 *et seq*.  ECF No. 46 ¶ 4.

On June 6, 2019, the Court held a hearing to resolve outstanding motions.  The Court denied the TRO motion and granted Wedderburn's oral motion to dismiss defendant Peterson from the suit.  ECF No. 37 at 1.   On January 23, 2020, the Court dismissed without prejudice Wedderburn's Amended Complaint, and granted in part Wedderburn's motion for leave to file a Second Amended Complaint solely to allege Rehabilitation Act violations that had occurred during the applicable limitations period, January 2017 through January 2019.  ECF No. 39 at 12, 15.

On March 17, 2020, Wedderburn filed a Second Amended Complaint alleging failure to accommodate, discrimination, retaliation, and harassment under the Rehabilitation Act.  ECF No. 46.   Read liberally, Wedderburn alleges that she was denied such reasonable accommodations as reassignment to a different middle school, adjustment of production standards, attenuation earplugs, an ergonomic chair, and extended leave; that contemporaneous employment performance plans were discriminatory and retaliatory; and that she was subjected to harassment on account of her disability.  *Id.*  BCPS filed a timely answer and after a lengthy discovery period, BCPS now moves for summary judgment in its favor on all claims.  ECF No. 68-1 at 4..

## II.     STANDARD OF REVIEW

Summary judgment is appropriate when the Court, viewing the evidence in the light most favorable to the non-moving party, finds no genuine disputed issue of material fact, entitling the movant to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). But "a court should not grant summary judgment 'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.'" *Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F.3d 52, 55 (4th Cir. 1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Casualty & Sur. Co.*, 381 F.2d 245, 249 (4th Cir. 1967)). Where the party bearing the burden of proving a claim or defense "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment against that party is warranted. *Celotex*, 477 U.S. at 322. Although a pro se party is "given some latitude," she may not avoid summary judgment by "relying on bald assertions and speculative arguments." *Mansfield v. Kerry*, No. DKC 15-3693, 2016 WL 7383873, at *2 (D. Md. Dec. 21, 2016) (citing *Smith v. Vilsack*, 832 F. Supp. 2d 573, 580 (D. Md. 2011)).

## III.   ANALYSIS

Wedderburn asserts four causes of action under the Rehabilitation Act: (1) failure to provide reasonable accommodations; (2) disability discrimination; (3) disability harassment; and (4) retaliation. ECF No. 46 ¶¶ 10, 18. The Court considers each claim in turn.

### A.      Failure to Accommodate

Wedderburn first asserts that BCPS failed to provide reasonable accommodation for her disabilities.  ECF Nos. 46 ¶ 11; 77-2 at 22–23.  To establish a prima facie case of failure to accommodate under the Rehabilitation Act, Wedderburn must show that "(1) she qualifies as an 'individual with a disability' as defined in 29 U.S.C.A. § 705(20); (2) the [Defendant] had notice of her disability; (3) she could perform the essential functions of her job with a reasonable accommodation; and (4) the [Defendant] refused to make any reasonable accommodation." *Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 414 (4th Cir. 2015).[6]

BCPS first argues that as a matter of law, Wedderburn is not disabled under the Rehabilitation Act.  ECF No. 68-1 at 25–26.  A "disability" under the Act is any "physical or mental impairment that substantially limits one or more major life activities of [an] individual; [] a record of such an impairment; or [] being regarded as having such an impairment."  42 U.S.C. § 12102(1); *see* 29 U.S.C. § 705(9)(B) (providing that 42 U.S.C. § 12102 will define the term "disability" for purposes of the Rehabilitation Act).  "[W]hether an individual's impairment is a disability . . . should not demand extensive analysis."  *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015).  This is so because "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity."  29 C.F.R. § 1630.2(j)(1)(iii).

When viewing the record most favorably to Wedderburn, sufficient evidence exists from which a reasonable factfinder could conclude she suffered from one of many qualifying

---

[6] "Employment discrimination claims brought under Section 504 are evaluated using the same standards as those 'applied under [T]itle 1 of the Americans with Disabilities Act of 1990.'" *Reyazuddin*, 789 F.3d at 413 (citation omitted).

disabilities.  Wedderburn submitted ample documentation that she has sciatica, cervical radiculopathy, lumbar spondylosis, connective tissue disorder, and PTSD.  ECF Nos. 77-4 at 9–12; 77-11 at 26–27; 77-12 at 3–4; *see also* ECF No. 68-7 at 29–35.  Each affects the daily activities of moving, sitting, and concentrating.  That IME evaluators at times disagreed with Wedderburn's healthcare provider may establish a genuine disputed issue of fact on the question of disability.  But it certainly does not support judgment as a matter of law.  *See Brady v. Bd. of Educ. Prince George's Cnty.*, 222 F. Supp. 3d 459, 469 (D. Md. 2016) ("Defendant's reliance on the fact that [plaintiff] was medically cleared to return to work does not alter the Court's conclusion" that plaintiff was disabled under Rehabilitation Act."); *Harrison–Khatana v. Washington Metro. Area Transit Auth.*, No. DKC 11-3715, 2015 WL 302820, at *13 (D. Md. Jan. 22. 2015) (finding doctor's clearance to return to work "does not invalidate Plaintiffs' claim that she had a disability for which she needed a reasonable accommodation to perform her job.").

BCPS next argues that Wedderburn cannot demonstrate she was denied any "reasonable" accommodations.  ECF No. 68-2 at 32–33.  An accommodation is reasonable if it is "feasible or plausible."  *See Reyazuddin*, 789 F.3d at 414 (citing *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401–02 (2002)).  To survive summary judgment, the employee "need only show that an accommodation seems reasonable on its face, and then the employer must show special (typically case-specific) circumstances that demonstrate undue hardship." *Id.* at 414 (quoting *Barnett*, 535 U.S. at 401–02, (2002)) (internal quotations omitted).  Relatedly, employers have "a good-faith duty to engage with their employees in an interactive process to identify a reasonable accommodation." *Jacobs*, 780 F.3d at 581 (internal quotations and brackets omitted).  Should the disabled employee fail to identify a reasonable accommodation, the employer is not liable for failure to accommodate.  *See id.*

The record indisputably reflects a lengthy interactive process between BCPS and Wedderburn.  Between 2016 and 2019, Wedderburn requested a total of 35 accommodations on at least 16 different dates, often asking for the same accommodation previously denied.  ECF Nos. 68-4 at 30–100; 68-5; 68-6; 68-7.  In particular, Wedderburn sought (1) reassignment to a school closer to her home; (2) adjustment of "production standards" and to avoid stress; (3) an ergonomic chair; (4) extended periods of leave; and (5) permission to wear attenuation ear plugs.  ECF Nos. 77-3 ¶¶ 31, 51, 55, 96–97; 68-4 at 5, 32–51, 59–61, 86; 68-7 at 36–52, 94–97.  As to these, BCPS maintains that the record reflects she had been granted the accommodation or that the request should be held unreasonable as a matter of law.  ECF No. 68-1 at 32–34.  The Court examines each request in turn.

### 1.     School Reassignment

Wedderburn repeatedly requested as an accommodation reassignment to a different school within 15 to 20 minutes of her home.  *E.g.*, ECF Nos. 68-4 at 54–55 (Aug. 9, 2018 transfer request), 56 (May 10, 2018 transfer request), 59–61 (Sept. 17, 2018 transfer request), 86 (Dec. 13, 2018 transfer request); 68-6 at 18–20 (Mar. 25, 2019 transfer request); 68-7 at 36–38 (May 8, 2019 transfer request), 93–97 (June 14, 2019 transfer request).  As grounds, Wedderburn asked first for placement close to her treating physicians so that she could minimize the time needed off for doctor appointments.  *E.g.*, ECF No. 68-4 at 55.  Next, she requested placement closer to home because the commute aggravated her back and neck pain.  *E.g.*, ECF No. 68-4 at 59–60.

Although BCPS gave many reasons for denying the requests, the one which remains wholly undisputed is that there were no available positions closer to Wedderburn's treaters or her home.  ECF Nos. 68-4 at 64–66; 68-7 at 1–9.  It is well settled that a reasonable accommodation

does not require an employer to either (1) create a position that does not exist; or (2) bump an existing employee from a position to accommodate the disabled employee. *Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954, 960 (4th Cir. 2021). Notably, once BCPS had an Assistant Principal position available, BCPS transferred Wedderburn as requested. ECF No. 68-4 at 16; ECF No. 77-13 at 24. On this record, no evidence suggests the previous denials of her request were unreasonable. Summary judgment is thus granted as to this request.

### 2. Adjustment of Production Standards and to Avoid Stress

Wedderburn also requested as an accommodation adjustment of the "production standards" of her position, ECF Nos. 68-4 at 6, 86, and relatedly to "avoid stress." ECF No. 68-7 at 93. The employee bears the burden of identifying an accommodation that allows her to perform her position, *Shin v. Univ. of Md. Med. Sys. Co.*, 369 Fed. App'x 472, 481 (4th Cir. 2010), and the employer is not required to provide every accommodation requested by the employee. *Brady*, 222 F. Supp. 3d at 470. Wedderburn has adduced no evidence as to what is meant by adjusting "production standards" and how such requested adjustment would accommodate her disabilities. A vague and inscrutable request simply cannot be considered reasonable. *See Carrozza v. Howard Cnty.*, 847 F. Supp. 365, 368 (D. Md. 1994), *aff'd* 45 F.3d 425 (4th Cir. 1995) (Rehabilitation Act does not require "an employer to so 'restructure' a job as to change its fundamental requirements, such as the ability to cope with its inherent stressors."); *see also Lewis v. Gibson*, No.12CV1189, 2014 WL 7151737, at *12 (M.D.N.C. Dec. 15, 2014) ("[T]o the extent Plaintiff was effectively requesting a change in his performance standards or reduced stress from his job demands, courts have routinely held that such a change is not a reasonable accommodation."). Similarly, the request to "avoid stress" failed to identify what accommodation she was seeking, and BCPS referral to its Employee Assistance Program in

response was eminently reasonable.  Accordingly, no facts support that BCPS' rejection of "performance standards" or "stress reduction" requests were unreasonable.  Summary judgment is therefore granted as to these as well.

### 3.   Ergonomic Chair

In March 2019, Wedderburn requested an ergonomic chair to assist with her back pain. ECF Nos. 77-3 ¶¶ 96–97; 77-11 at 26–27.  On March 29, 2019, BCPS approved Wedderburn's request and provided a chair with (1) seat glide depth mechanism, (2) seat/angle adjustment, (3) adjustable back heigh and lumbar cushioning, and (4) height pivot-adjustable arm, per Wedderburn's specifications.  ECF Nos. 68-4 ¶ 29; 68-7 at 11.  According to Wedderburn, the accommodation was ineffective and amounted to a denial because the chair aggravated her symptoms.  ECF Nos. 46 ¶ 28; 77-3 ¶ 97.  When Wedderburn notified Peterson of the chair's problem, Peterson stated that BCPS would "work to identify a different ergonomic chair" to meet Wedderburn's needs.  ECF No. 68-7 at 22–23.  Wedderburn, in turn, stated she would purchase her own chair.  *Id.*

An employer is not required to provide an employee's choice of accommodation. *Reyazuddin v. Montgomery Cnty.*, 7 F. Supp. 3d 526, 549 (D. Md. 2014), *rev'd on other grounds*, 789 F.3d 407 (4th Cir. 2015).  The provided accommodation must be effective—that is, address the disability-related limitations identified by the employee as an inhibitor to performing the essential functions of her job.  *See Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F. Supp. 720, 736 (D. Md. 1996); *see* 29 C.F.R. § 1630.2(*o*)(1)(ii).  In this respect, the record reflects that BCPS provided Wedderburn with a chair meeting her identified requirements to accommodate the back pain caused by her disability.  BCPS also offered to continue searching for a suitable accommodation when Wedderburn rejected the provided chair.  ECF No. 68-7 at

20

22–23.  Where here, BCPS plainly engaged in efforts to provide Wedderburn with her request, and Wedderburn elected to provide her own accommodation instead, BCPS has not "denied' Wedderburn a reasonable accommodation.  Summary judgment is granted as to this request.

### 4.    Extended Leave

Wedderburn requested six weeks of continuous leave on April 11, 2019, 90 days of leave on May 8, 2019, and four weeks of leave on May 14, 2019 as an accommodation.  ECF No. 68-7 at 12–19, 36–38, 42–43.  Wedderburn's initial FMLA leave request sought leave beginning on April 11, 2019, and ending on approximately May 24, 2019, to assist her in managing symptoms of her PTSD.  ECF No. 68-7 at 14–18.  The request was accompanied by a note from Wedderburn's psychiatrist recommending the leave period through May 24, 2019.  *Id.*  This request was initially denied, but then retroactively granted.  ECF No 68-7 at 42–43, 50–52.

Although the record is difficult to follow as to which leave periods had been taken based on FMLA, the leave requested as an accommodation beyond May 24th evidently was denied because, by definition, Wedderburn could not perform the essential functions of her job if she were on leave that extended over weeks, if not months.  ECF No. 68-7 at 51.  Leave requests, to be sure, may constitute reasonable accommodation when needed for necessary treatment or rehabilitation.  *See* 29 C.F.R. § 1630.2(*o*) (Appendix) (2011) ("[O]ther accommodations could include permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment."); *Moore v. Md. Dep't of Pub. Safety & Corr. Servs. Patuxent Inst.*, No. CCB-11-0553, 2013 WL 549864, at *4 (D. Md. Feb. 13, 2013).  But an employer is not compelled to write a blank check for an indefinite leave period to accommodate an employee's disability.  *Myers v. Hose,* 50 F.3d 278, 283 (4th Cir. 1995).  Rather for a leave request to constitute a reasonable accommodation, it must be "finite and will be reasonably likely to enable

the employee to return to work." *Moore*, 2013 WL 549864 at *4 (quoting *Kitchen v. Summers Continuous Care Ctr., LLC,* 552 F. Supp. 2d 589, 596 (S.D.W. Va. 2008)).  The plaintiff bears the burden of demonstrating that the period of extended leave would foreseeably enable her to perform the essential functions of her position.  *See Kitchen*, 552 F. Supp. 2d at 596.

Importantly, Wedderburn does not dispute that on site attendance is an essential job function for the CMS Assistant Principal position.  Nor has she developed any contrary evidence suggesting that she could have performed her duties from home.  Accordingly, general requests for weeks of leave not geared to any end date cannot assure performance of her essential job functions.[7]

Moreover, nothing in the record suggests that the leave request, if granted, would allow Wedderburn to perform the essential functions of her job.  Between July and December of 2018, Wedderburn had taken nearly six school weeks of leave.  ECF Nos. 68-4 at 91–92; 68-3 at 55–58.  When she returned to CMS in February 2019, she worked only seven weeks before taking her first period of extended medical leave under the FMLA on April 11, 2019 and remained on leave until May 27, 2019.  The record thus reflects that as soon as Wedderburn would return to school, she would need more time off.  Construing this record most favorably to Wedderburn, she cannot demonstrate how more leave, with no fixed end, would allow her to perform her essential job functions.  *See Moore*, 2013 WL 549864, at * 5 (granting summary judgment when plaintiff had not "demonstrated that extending her leave of absence would have enabled her to perform the essential functions of her job in the immediate future."); *see also Kitchen*, 552 F.

---

[7] The requests were conditional—Wedderburn needed some weeks of leave to treat "flareups" that occurred when she was working.  Indeed, her own treating physician noted great uncertainty as to how much leave Wedderburn would need and when.  ECF No. 68-4 at 48.

Supp. at 596 (extended period of leave not a reasonable accommodation when plaintiff failed to offer evidence it would enable her to return to work and perform essential functions of position).

To be sure, and in fairness to Wedderburn, she likely continued to suffer from symptoms of PTSD after May 24, 2019, the date by which she wished to extend her leave indefinitely.  But that alone does not render the request reasonable.  Not only was the accommodation request open ended, Wedderburn had not provided any medical documentation supporting that her disability required additional leave beyond that date.  *See, e.g.*, *May v. Roadway Express, Inc.*, 221 F. Supp. 2d 623, 627 (D. Md. 2002) ("Plaintiff's undisputed and complete failure to respond to [the] request [for documentation] is fatal to his failure to accommodate claim."); *Wilson v. Bd. of Educ. Prince George's Cnty*, No. 12-2092, 2013 WL 3146935, at *4 (D. Md. June 18, 2013) (quoting *May*, 221 F. Supp. 2d at 627) (an employee must "in good faith, engage[] in an interactive process to identify, in cooperation with the employer, what would constitute a reasonable accommodation.").  Summary judgment on this claim is granted.

### 5.    Attenuation Earplugs

Lastly, the request for ear plugs compels a different result.  Wedderburn continued to suffer from headaches and tinnitus, and filtering loud noise ameliorated her symptoms.  ECF Nos. 77-3 ¶ 31; 68-4 at 83–84; 68-7 at 29–35; 77-4 at 12.  Wedderburn had originally, and repeatedly, requested the accommodation of standard earplugs.  *E.g.*, ECF No. 68-4 at 44–50. The request had been denied as unreasonable.  *Id.*  In response, Wedderburn refined her requests. Now, she asked to use attenuation earplugs which are capable of blocking certain sounds while sharpening the clarity of such other sounds as voices.  ECF No. 68-4 at 30–42.  Wedderburn asserted that she could still communicate with others and perform her essential job functions while wearing the earplugs.  ECF Nos. 77-3 ¶¶ 39, 41; 77-6 at 24–31.  BCPS denied the use of

attenuation earplugs outright, citing nonspecific "safety concerns."  ECF No. 68-4 at 30–42.  Nor did BCPS engage in any meaningful interaction with Wedderburn about how these earplugs work, and whether blocking certain noises, but not all sound, in fact raised any real safety concerns.  *See Reyazuddin*, 789 F.3d at 414 (quoting *Barnett*, 535 U.S. at 401–02) (employer must show "special (typically case-specific) circumstances that demonstrate undue hardship.").

Indeed, BCPS' flat denial of this request is a hard sell.  Taken to its logical conclusion, it suggests that all school administrators must be able to hear all noises, at all times, or they are incapable of doing their jobs.  Because the record, viewed most favorably to Wedderburn, could support that attenuation earplugs did not unreasonably interfere with performing the essential job functions of Assistant Principal, the motion must be denied.  *Cf.  Webster v. Chesterfield Cnty. Sch. Bd.*, No. 20-344-HEH, 2020 WL 6064352, at * 4 (E.D. Va. Oct. 14, 2020) (plaintiff alleged prima facie case of failure to accommodate when school refused request to wear earplugs despite plaintiff's asserted ability to hear while wearing them).[8]

In sum, Wedderburn's failure to accommodate claim on her requests for school reassignment, an ergonomic chair, extended leave and to avoid stress and reduce production standards fails as a matter of law.  As to the request for attenuation ear plugs, summary judgment is denied.  The Court next turns to Wedderburn's discrimination and retaliation allegations.

## B.    Disability Discrimination

Turning next to the discrimination claim, Wedderburn alleges that Magness' unfavorable employment evaluations and insistence on a performance improvement plan were fueled by discriminatory animus.  ECF Nos. 46 ¶¶ 16–17; 77-3 ¶¶ 55-59, 101, 104–06.  A prima facie disability discrimination case requires the plaintiff to demonstrate that she "(1) has a disability;

---

[8] Wedderburn does not contest that as to the remaining accommodations requests, she either received the accommodation or withdrew the request.  ECF No. 68-7 at 11, 93–101.

(2) is otherwise qualified for the job in question; and (3) suffered an adverse employment action solely because of [her] disability." *Rock v. McHugh*, 819 F. Supp. 2d 456, 470 (D. Md. 2011) (citing *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265 (4th Cir.1995)).  If the plaintiff establishes a prima facie case, the burden shifts to defendant to provide a legitimate, nondiscriminatory reason for its conduct.  *Hannah P v. Coates*, 916 F.3d 327, 342 (4th Cir. 2019); *see Perry v. Comput. Scis. Corp.*, 429 Fed. App'x 218, 219–20 (4th Cir. 2011) (applying *McDonnell Douglas* framework to Rehabilitation Act claim).  If the defendant provides such a reason, the plaintiff "bears the ultimate burden of persuasion and must show by a preponderance of the evidence that the proffered reason was pretext for discrimination." *Hannah*, 916 F.3d at 342 (internal quotes omitted).

BCPS first contends that the alleged discriminatory acts fail as a matter of law because none of them constitute an adverse employment action.  ECF No. 68-1 at 27.  An employment action is sufficiently adverse if it "alters the terms, conditions, or benefits of employment." *Rock*, 819 F. Supp. at 470.  Relevant here, poor performance evaluations alone do not constitute an adverse action unless those evaluations are used "to detrimentally alter the terms or conditions of the recipient's employment." *James v. Booz-Allen & Hamilton*, 368 F.3d 371, 377 (4th Cir. 2004) (quoting *Spears v. Missouri Dep't of Corr. & Human Res.*, 210 F.3d 850, 854 (8th Cir. 2000)) (analyzing Title VII claim).

When viewing the record most favorably to Wedderburn, none of the asserted adverse actions can sustain the claim.  Magness' attendance review resulted in no sanction, just future monitoring.[9]  Likewise, the interim and final evaluations had not been glowing, but Wedderburn

---

[9] Wedderburn also takes issue with Magness' imposition of core work hours (7:30 a.m. – 3:30 p.m.) as somehow targeted toward her.  The Court finds no support in the record for his allegation.  To the extent time and attendance issues arose as to Wedderburn, they are adequately captured in her claim arising from Magness' review of Wedderburn for taking leave without authorization.

ultimately received an overall score of "effective" for the 2017–2018 school year.  ECF No.  68-3 at 42–46.  And as to her placement in an improvement plan, she suffered no reduction in title, rank, pay, or benefits.  Accordingly, even if a reasonable trier of fact would agree with Wedderburn that her evaluations were "poor" or unfair, they simply do not rise to the level of an "adverse employment action" for purposes of this claim.

Alternatively, even if Wedderburn had proved her prima facie case, no evidence supports that the actions were pretextual.  Monitoring her attendance was clearly justified; Wedderburn had missed 82 hours of work in the first few months of the 2017–2018 school year, and 28 days in the first half the of following school year.  ECF Nos. 68-3 at 16–25, 45; 68-4 at 92.  Neither party disputes that an Assistant Principal must be at school during school to adequately do her job.  Thus, the record reflects the legitimate non-discriminatory grounds for BCPS taking responsive action to her excessive absence.

Similarly, the stated grounds for her unfavorable employment evaluations included poor and unprofessional email communication, lack of responsiveness to assigned tasks, and failure to communicate with parents.  ECF No. 68-3 at 43–46, 74–80.  Apart from Wedderburn's own disagreement with the evaluations, no evidence contradicts the stated reasons, and the robust support for the same.  *See id.*; ECF No. 68-3 at 4–7, 37–58; *see also Hannah*, 916 F.3d at 343 (poor performance evaluation alone not enough to raise genuine issue of fact when evaluation was based on employee's poor attendance and not her disability).  Because no evidence gives rise to an inference that the challenged actions were pretextual, the claim cannot survive.  Summary judgment as to the discrimination claim is granted.

### C.      Harassment—Hostile Work Environment

Nor do Wedderburn's "harassment" claims survive challenge.  ECF No. 73-2 at 25–28.
To establish a hostile work environment, a plaintiff must adduce evidence that on account of her
disability, she had been subjected to sufficiently severe or pervasive unwelcome conduct that
altered the conditions of her employment.  *Pueschel v. Peters,* 577 F.3d 558, 564–65 (4th Cir.
2009) (citing *Ocheltree v. Scollon Prods., Inc*., 335 F.3d 325, 338 (4th Cir. 2003) (en banc)).  For
employer misconduct to be sufficiently severe, the workplace must be "permeated with
discriminatory intimidation, ridicule, and insult." *Bell v. Shulkin*, 709 Fed. App'x 167, 169-70
(4th Cir. 2017) (quoting *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21 (1993)).  "[O]rdinary
tribulations of the workplace" will not suffice.  *Id.* (quoting *Faragher v. City of Boca Raton*, 524
U.S. 775, 788 (1998)).  Further, the test of workplace hostility is an objective one—a plaintiff
must demonstrate that a reasonable employee in her shoes would perceive the employer's actions
to be "objectively hostile." *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 178 (4th Cir. 2001).  "Such
proof depends upon the totality of the circumstances, including the frequency of the
discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere
offensive utterance; and whether it unreasonably interferes with an employee's work
performance." *Bonds v. Leavitt*, 629 F.3d 369, 385 (4th Cir. 2011) (internal quotations omitted)
(Title VII).

Especially relevant here, employer denial of accommodations alone does not create a
hostile work environment.  *See Anderson v. Sch. Bd. of Gloucester Cnty.*, No. 18-745, 2020 WL
2832475, at *24 (E.D. Va. May 29, 2020); *see also Floyd v. Lee*, 85 F. Supp. 3d 482, 517 n.54
(D.D.C. 2015).  Surely, Wedderburn bitterly disagreed with Peterson's decisions.  But no

evidence suggests that Peterson's words or acts created a workplace permeated with ridicule or intimidation on account of Wedderburn's disabilities.  *See Fox*, 247 F.3d at 178.

The same can be said for Magness' performance evaluations.  While unpleasant for Wedderburn, corrective action to address an employee's professional shortcomings, even if misplaced, does not objectively create a hostile or abusive environment.  *See Pueschel*, 577 F.3d at 566 ("isolated personnel decisions" not severe or pervasive enough to form a hostile work environment claim).  Wedderburn's palpable displeasure with BCPS' decisions is simply not enough to sustain the claim.  Summary judgment is granted in BCPS' favor.

### D.     Retaliation

Lastly, Wedderburn argues that she had been placed in Options at the end of 2018 in retaliation for seeking yet another round of accommodations, and because she had complained to BCPS administrators about perceived discrimination and harassment.  ECF Nos. 46 ¶¶ 18–19; 77-3 ¶¶ 78–80.  An employer may be liable for retaliation if the plaintiff (1) engaged in a protected activity; (2) the employer took an adverse employment action against her; and (3) a causal connection exists between the two.  *Smith v. CSRA*, 12 F. 4th 396, 416 (4th Cir. 2021).  An adverse action is any that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Brady*, 222 F. Supp. at 474 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  If a plaintiff establishes a prima facie case, the employer must articulate a non-retaliatory reason for the action.  *Id.* (citing *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 78 (4th Cir. 2016)).  The burden then shifts back to the employee to demonstrate that the stated reason for the adverse action is pretextual.  *Id.*

BCPS first argues that no trier of fact could view Options as sufficiently adverse to sustain the claim.  ECF No. 68-1 at 25–26.  The Court disagrees.  Options is a program of last

resort, at least it was for Wedderburn.  BCPS expressly informed her that once placed in Options, she must decide if she would resign, retire, or find a position *other than* as an Assistant Principal. ECF No. 77-11 at 8.  In this respect, a reasonable juror could conclude that because Options essentially ends a person's employment in her current position, it is sufficiently adverse.  So while Options may be viewed as BCPS urges—a stopgap measure to help a medically unfit employee find another position—it nonetheless constitutes removal from Wedderburn's current position, and so sufficiently adverse to support a retaliation claim.

BCPS next argues that even if Options represents an adverse action, her placement in it bears no causal relationship to Wedderburn's having engaged in protected conduct.  ECF No. 68-1 at 26–27.  Again, the evidence points in both directions.  For one, Wedderburn's placement in Options was inextricably intertwined with her accommodations request.  A day after she requested a new slate of accommodations, the EEO Office, through Peterson, informed her that not only were the requests "unreasonable," they also demonstrated she was unfit for her job. ECF No. 68-4 at 87–94.  For another, a reasonable juror could conclude BCPS' own failure to adhere to its stated Options criteria raises an inference of retaliation.  As Wedderburn highlights, BCPS may place an employee in Options only after the employee has been "*medically determined* unable to effectively and safely perform the essential functions" of her position. ECF No. 68-5 at 4 (emphasis added).   But BCPS took no steps to make any such medical determination, as it had in 2016 when Wedderburn had first been injured, and again in the Spring of 2019.  ECF Nos. 68-4 at 48–50; 68-7 at 29–35.  BCPS also dismissed outright the contemporaneous opinions of three physicians stating that Wedderburn could return to work "with or without accommodations."   ECF Nos. 68-5 at 16–18; 77-11 at 9; 68-6 at 1–2. Although a jury may ultimately agree with BCPS that these evaluations were too flimsy to credit,

it could just as easily conclude that BCPS ignored them because it wanted, once and for all, to be done with fielding Wedderburn's seriatim accommodation requests.

In the end, a reasonable juror could conclude that BCPS invoked Options not because Wedderburn qualified for it, but because she asked for accommodations that BCPS found to be unreasonable.  But if an employee runs the risk of losing her position because she asked for an "unreasonable" accommodation, then certainly the employee would be dissuaded from requesting any accommodation in the first instance.  Summary judgment must therefore be denied on this claim.[10]

## IV.   Conclusion

For the foregoing reasons, the motion for summary judgment is granted in part and denied in part.  A separate order follows.


February 18, 2022                                              /s/
Date                                               Paula Xinis
                                                   United States District Judge


---

[10] Wedderburn should not read victory at trial into the Court's decision.  Her 28 days of absences in the first half of 2018 alone may lead the trier of fact to conclude her disabilities rendered her medically unable to act as an Assistant Principal, thus supporting the placement in Options as legitimate and non-retaliatory.  But at the summary judgment stage, if a contrary inference may be drawn from other facts, the claim must proceed.